# United States Court of Federal Claims

No. 16-540C
(Filed: August 31, 2016)
Reissued: September 22, 2016[1]

| | | |
|---|---|---|
| TAT TECHNOLOGIES, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES, | ) | Bid Protest |
| | ) | |
| Defendant. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| WALL COLMONOY CORPORATION, | ) | |
| | ) | |
| Defendant-Intervenor. | ) | |

*W. Brad English*, Maynard, Cooper, & Gale, P.C., Huntsville, AL, for Plaintiff.

*William Porter Rayel*, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendant.

*John R. Tolle*, Baker, Cronogue, Tolle, & Werfel, LLP, McLean, VA, for Defendant-Intervenor.

**OPINION AND ORDER**

**SMITH, Senior Judge**

    This action comes before the Court on the parties' cross-motions for judgment on the Administrative Record. Plaintiff, TAT Technologies, LTD ("TAT"), challenges the Defense Logistics Agency – Aviation's ("Agency") decision to qualify Wall Colmonoy Corporation ("WCC") as a legitimate source to manufacture a heat exchanger originally developed by TAT. Plaintiff alleges that the Agency failed to follow applicable law and conduct a reasonable inquiry into WCC's qualification to manufacture the heat exchanger and inappropriately issued a

---

[1] An unredacted version of this opinion was issued under seal on August 31, 2016. The parties were given an opportunity to propose redactions, but no such proposals were made.

solicitation on a Service-Disabled Veteran-Owned Small Business ("SDVOSB") sole-source basis. Plaintiff requests that the Court do the following: (1) declare that the Agency's qualification of WCC to manufacture the heat exchanger was arbitrary, capricious, an abuse of discretion, and contrary to law; (2) require the Agency to perform or otherwise request an inquiry into WCC's right and ability to produce the heat exchanger, in strict accordance with applicable law; (3) enjoin the Agency from recognizing WCC as a qualified source of supply pending such inquiry; (4) require the Agency to procure the heat exchanger only from qualified sources; (5) declare that the Agency's SDVOSB sole source set-aside decision was arbitrary, capricious, an abuse of discretion, and contrary to law; and (6) enter a permanent injunction preventing the Agency from accepting offers under the Solicitation, as currently drafted. For the following reasons, the Court must deny plaintiff's motion for judgment on the administrative record and grant defendant and defendant-intervenor's motion for judgment on the administrative record.

**I.      Findings of Fact**

TAT is the original equipment manufacturer ("OEM") of a proprietary heat exchanger developed for use in the F-15 aircraft. Second Amended Complaint (hereinafter "2nd Am. Compl.") at 3. The exchanger was first built in 1989 to enable the Israeli Air Force F-15E to withstand desert conditions. *Id.* TAT identified the exchanger as Part No. 8140-1 and began selling it to the Israeli Air Force. *Id.* In 1990, the United States Air Force (hereinafter "Air Force" or "Agency") became interested in the heat exchanger. *Id.* TAT provided its design specifications to the Agency so that it might evaluate and approve TAT's design. *Id.* The Agency approved TAT's proprietary design and began purchasing the heat exchangers for use in their own F-15Es. *Id.* The Agency has purchased several hundred heat exchangers from TAT over the years, in quantities ranging from 1 to 210, at an average price between $15,000 and $20,000 dollars each. *Id.* Before WCC was approved as a source for the heat exchanger, TAT was the only approved source. *See* Administrative Record (hereinafter "AR") 779.

In November of 2009, WCC contacted Boeing to express interest in becoming a qualified alternative source for the F-15 primary heat exchanger. AR 3. WCC provided a computer model of its variant of the exchanger. AR 4-7. Because Boeing had not budgeted for WCC's qualification, Mr. Chris Dofflemeyer agreed that the Agency would qualify WCC's exchanger. AR 10. On April 12, 2010, Boeing sent a letter to Dofflemeyer and other Agency personnel regarding the heat exchanger specifications that it had developed for the Agency. *Id.* It included a series of requirements, standards, and testing procedures. *Id.*

On September 9, 2010, WCC submitted its Source Approval Request ("SAR") to the Agency under the "Similar Item" category. AR 17. WCC stated that it had successfully reverse engineered the F15 primary heat exchanger "from scratch using an existing model." AR 279, 284. The Agency responded with a disapproval letter which stated that "[t]he current offer has been disapproved until testing of the item is accomplished." AR 289. Along with the disapproval letter, the Agency provided WCC with a copy of four tests WCC needed to perform. AR 294-95. On or about July 28, 2011, WCC submitted a test plan developed to meet the testing requirements attached to the Agency's disapproval letter. AR 302. In September of 2011, the Agency approved WCC's primary heat exchanger as a qualified source and assigned it part

number 8140-1 (the same number assigned to TAT's product). AR 334, 347. The Agency explicitly approved WCC's primary heat exchanger as a "similar item" which required access to OEM's technical data. WCC did not have access to TAT's data. AR 321.

On August 30, 2012, Agency engineer, Mr. Bonner, sent an email to the Air Force requesting that WCC's contracts be put on hold as WCC's heat exchanger lacked proper qualification testing. AR 351. Dofflemeyer sent an email to WCC requiring a post-approval first article vibration test. AR 349-50. On October 1, 2012, Bonner objected again to the incomplete testing and improper qualification of WCC's primary heat exchanger. Plaintiff's Motion for Judgment on the Administrative Record (hereinafter "P's MJAR __.") at 11. In March of 2013, Bonner again objected to the incomplete testing and qualifications of WCC's heat exchanger. AR 848. Bonner reiterated that WCC needed to qualify under the same testing as TAT. AR 690. Dofflemeyer again only ordered WCC to perform a vibration test. AR 647, 1030. The Agency then awarded WCC an SDVOSB sole source contract. AR 1027.

On February 10, 2016, TAT objected to the Agency's qualification of WCC as a source for F-15E primary heat exchangers. AR 650-55. On March 21, 2016, TAT objected again to WCC's qualification and provided the Agency with a copy of its proprietary information and a second copy of a letter sent by counsel stating that TAT is the OEM and the "SINGLE" legitimate source for the item. P's MJAR at 14. The Agency eventually resolved the issue by allowing WCC to change its part number. AR 675.

On March, 18, 2016, the Agency issued a pre-solicitation notice for primary heat exchangers. AR 695-696. The Agency stated that it intended to issue the solicitation on an SDVOSB sole source, set-aside basis. *Id.* The Agency temporarily suspended its SDVOSB requirement after receiving TAT's March 21, 2016, email. AR 666. On March 30, the Agency re-opened the solicitation and stated its intent to award to WCC. AR 699. The Agency issued the Solicitation on May 31, 2016, which stated that the Agency intended to solicit with a SDVOSB set-aside to WCC. AR 704. TAT has complained multiple times that WCC was not in fact an SDVOSB because it is a wholly-owned subsidiary of another company. AR 642, 645; 744-70. On June 6, 2016, TAT's counsel presented documentation to the contracting officer suggesting that WCC is owned by another company, and not a service-disabled veteran. Defendant's Cross-Motion for Judgment on the Administrative Record (hereinafter "D's CMJAR") at 12. On July 12, 2016, the contracting officer submitted a protest to the Small Business Administration ("SBA") questioning WCC's SDVOSB status. The SBA has not yet decided the protest. *Id.* at 12-13.

## II. Discussion

### A. Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which provides the Court of Federal Claims the power "to render any judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States . . . in cases

3

not sounding in tort." 28 U.S.C. § 1491(a)(1).  This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b).  The Court evaluates bid protests under the Administrative Procedure Act's standard of review for an agency action.  *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Under Rule 52.1 of the Rules of the Court of Federal Claims, the parties are limited to the Administrative Record, and the Court makes findings of fact as if it were conducting a trial on a paper record.  *See id*. at 1354.  Looking to the Administrative Record, the Court must determine whether a party has met its burden of proof based on the evidence in the record.  *Id*. at 1355.

Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1) which requires the bid protest to be brought by an "interested party."  A protestor is an "interested party" if it is an "(1) actual or prospective bidder and (2) possess[es] the requisite direct economic interest."  *Weeks Marine, Inc., v. United States*, 575 F.3d 1359 (Fed. Cir. 2009) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  "To prove a direct economic interest as a putative prospective bidder, [the bidder] is required to establish that it had a 'substantial chance' of receiving the contract."  *Id.*; *see also Info. Tech. & Appl. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process.");  *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1580 (Fed. Cir. 1996).  The nature of the protest will dictate the necessary factors for a "direct economic interest."  *Sys. Appl. & Techs. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

### B. Qualification

The primary issue plaintiff raised is that proper testing was not performed on WCC's product, while TAT's product was extensively and rigorously tested.  Plaintiff alleges that the Air Force received an inferior product as a result of the deficient testing, and TAT, whose product had successfully accomplished all of the tests, was treated unfairly.

The product at issue here is a heat exchanger, which costs between $15,000 and $20,000 and is a critical component in the F-15 fighter jet.  2nd Am. Compl. at 3.  It was originally developed for the Israeli Air Force.  *Id*.  In 1990, the U. S. Air Force began using it in the U.S. planes, and, until WCC was approved, TAT was its only supplier.  AR 799.  The Air Force began looking at WCC as an additional heat exchanger supplier in 2010.  AR 17.  WCC submitted a proposal and began its attempt to obtain approval for their own version of the heat exchanger, which was allegedly reverse engineered from TAT's heat exchanger.  AR 17, 279.

The plaintiff contends that procurement rules dictate that WWC must successfully undergo the same tests as those which qualified TAT to provide the heat exchanger.  In arguing that WCC was not qualified to provide the heat exchanger, the plaintiff relied heavily on the following provision of the Code of Federal Regulations:

> If a qualification requirement applies, the contracting officer need consider only those offers identified as meeting the requirement…unless an offeror can satisfactorily demonstrate to the contracting officer that it or its product or its

        subcontractor or its product can meet the standards established for qualification before the date specified for award.

48 C.F.R. § 9.206-1(c). A qualification requirement is "a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of the contract." 10 U.S.C. § 2319(a). The Federal Acquisition Regulation ("FAR"), through the DoD 4120.24-M, states that product testing "must be done on an equitable basis…to achieve fair treatment of all manufacturers with the capability to meet the performance, quality, and reliability requirements in the specification." DoD 4120.24-M at 1.

      Plaintiff contended that the regulations required each offeror successfully complete the same test regime for its heat exchanger, and that WCC could not be qualified as a supplier because it did not complete all of the tests. The FAR states that, when a qualification requirement exists, an agency "must specify all requirements that a potential offeror (or its product) must satisfy in order to become qualified." 48 C.F.R. § 9.202(a)(iii). However, plaintiff ignores the fact that, prior to the establishment of a qualification requirement, DoD must "prepare a written justification stating the necessity for establishing the qualification requirement and specify why the qualification requirement must be demonstrated before contract award." 10 U.S.C. § 2319(b)(1). This written justification was never created. Absent the written justification, this Court cannot presume that the Agency intended offerors to be subject to a qualification requirement that was never made explicit.

      This Court agrees with defendant's assertion that no qualification requirement exists here, and that "nothing in the procurement specification set forth 'a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract.'" D's CMJAR at 21 (citing 10 U.S.C. § 2319(a)). Despite the plaintiff's insistence that such a testing regime exists, none has been identified. The Court scoured the Administrative Record and could not locate any indication of a qualification requirement other than a few emails referring to the "procurement spec." that WCC would be compared to. AR 350-51, 848. This Procurement Specification established "the requirements for performance, design, development, test and compatibility of equipment in the F-15 Aircraft," but no part of those tests were required to be performed prior to the contract award. AR 399, 482-87. Even if the Court had been able to identify TAT's original testing plan, it is important to note that TAT underwent its qualifying tests over 20 years ago. It is reasonable to assume that, during the past 20 years, technology standards would have changed such that TAT's original testing regime would have been significantly modified and many of the tests would now be unnecessary and inapplicable.

      Additionally, Courts have neither the expertise nor permissible discretion to decide on technical and prudential decisions, such as how many safety tests should be run on a military aircraft. Absent a regulatory provision establishing the test protocol or quantified testing plan, this area is one of broad discretion for the Air Force or DoD, but not the Court. TAT's argument, while appearing persuasive, has simply pieced together various sources to infer a test requirement that did not actually exist. The argument is ultimately not reasonable, as it leads to a conclusion that lacks any support in the law or regulations.

      **C.  Waiver**

In its cross-motion for judgment on the Administrative Record, defendant raised an additional dispute: whether plaintiff's claims are barred by the doctrine of waiver or laches. Essentially, defendant alleges that, as plaintiff failed to raise the qualification issue in its 2013 protest, TAT has waived that argument for the current protest. Defendant states that a plaintiff who "has had the opportunity to object to the terms of a government solicitation…and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." D's CMJAR at 15 (citing *Blue and Gold Fleet, LP v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)). Defendant applies that standard to the case at bar, contending that, as TAT did not protest the WCC source approval for the heat exchanger in its 2013 protest, Count I of TAT's complaint is waived. D's CMJAR at 16.

This Court is not persuaded by that argument. Plaintiff was only made aware of the qualification issue upon its receipt of the Administrative Record. As such, plaintiff could not have raised this issue prior to this protest. Defendant's argument turns the theory of discovery on its head, sending the message that a party should sue to see if it can find anything that might allow it to have a claim! Litigation is not a fishing expedition. Encouraging parties to sue in order to find a basis for a suit has never been something the judiciary has encouraged.

### D. SDVOSB Status

The final issue is whether WCC is a valid disabled veteran owned small business. Plaintiff's argument raises the question of whether this Court has the jurisdiction to decide this issue. The simple answer is no. By statute, jurisdiction over SDVOSB status lies with the SBA. *See* 15 U.S.C. § 657f(d). After a number of complaints from the plaintiff, the government finally filed a protest of WCC's SDVOSB status with the SBA, and the SBA is now considering the issue.

Despite the fact that SVDOSB issues are confined within the jurisdiction of the SBA, plaintiff contends that this Court can still decide this issue because of its connection to this procurement protest. Plaintiff argues that "the Court of Claims jurisdiction is not limited to the terms of the actual procurement, but encompasses an alleged violation of regulation or statute connected to a procurement." Plaintiff's Reply in support of P's MJAR (hereinafter "P's Reply") at 16 (citing *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1289 (Fed. Cir. 1999)). In theory that argument seems quite rational and logical. However, statutory construction requires the Court to read the general jurisdictional grants in light of the SBA's more specific statutory scheme. That statute makes it clear that this Court has no authority to hear the issue until after the SBA issues a decision on the same.

### III. Conclusion

For the reasons set forth above, plaintiff's MOTION for Injunctive and Declaratory Relief is **DENIED**. Additionally, defendant and defendant-intervenor's CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED**. However, this does not totally dispose of this case. Since the SBA's decision is still pending and may have some impact on the issues

herein, the court will retain jurisdiction in this case.  On or before September 30, 2016, the parties shall update the Court on the status of the SBA protest, with any joint recommendations in light of the outcome of the aforementioned SBA protest, so that this Court may determine whether it should retain that jurisdiction or dismiss the case.  The Clerk is directed to enter judgment on the Administrative Record in favor of defendant and defendant-intervenor, consistent with this Opinion.[2]

**IT IS SO ORDERED.**

s/ *Loren A. Smith*
Loren A. Smith,
Senior Judge

---

[2] This opinion shall be unsealed, as issued, after September 14, 2016, unless the parties identify protected and/or privileged materials subject to redaction prior to that date.  Said materials shall be identified with specificity, both in terms of the language to be redacted and the reasons therefor.